IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Scott B. Sullivan      )
_____ )
_____ )
_____ )
_____ )
(Enter above the full name of the Plaintiff(s) )
     )
vs.      )    Case Number_____2:22-cv-2319-JAR-TJJ_____
     )
John M. Graham, Jr. et. Al.      )
Name      )
7400 College Blvd. Suite 550      )
Street and number      )
Overland Park, KS 66210      )
City      State      ZipCode )

(Enter above the full name and address of the
Defendant in this action - list the name and
address of any additional defendants on the back
side of this sheet).

## CIVIL COMPLAINT

I.     Parties to this civil action:

     (In item A below, place your name in the first blank and place your present address in the
second blank. Do the same for additional plaintiffs, if any, on the back side of this sheet).

     A.     Name of plaintiff Scott B. Sullivan_____

           Address 7214 W 71st Terrace_____

           Overland Park, KS 66204_____

           _____

(In item B below, write the full name of the defendant in the first blank. In the second blank, write the official position of the defendant. Use item C for the names and positions of any additional defendants).

B.      Defendant John M. Graham, Jr. _____ is

        employed at The Steven G. Piland Law Firm _____

        7400 College Blvd, Ste. 550; Overland Park, KS 66204 _____

C.      Additional Defendants Melinda Young _____

        Melinda Young Law, LLC. _____

        1 EAST 30TH AVENUE, HUTCHINSON, KS 67502 _____

II.    Jurisdiction:

       (Complete one or more of the following subparagraphs, A., B.1, B.2., or B.3., whichever is applicable.)

       A.  (If Applicable) Diversity of citizenship and amount:

            1.      Plaintiff is a citizen of the State of _____ Kansas _____.

            2.      The first-named defendant above is either

                    a.  a citizen of the State of _____ Kansas _____; or

                    b.  a corporation incorporated under the laws of the State of
                         _____ and having its principal place of business
                         in a State other than the State of which plaintiff is a citizen.


            3. The second-named defendant above is either

                    a.  a citizen of the State of _____ Kansas _____; or

                    b.  a corporation incorporated under the laws of the State of
                         _____ and having its principal place of business in a
                         State other than the State of which plaintiff is a citizen.


       (If there are more than two defendants, set forth the foregoing information for each additional defendant on a separate page and attach it to this complaint.)
       Plaintiff states that the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars ($75,000.00).

B.    (If applicable)   Jurisdiction founded on grounds other than diversity (Check any of the following which apply to this case).

☐   1.   This case arises under the following section of the Constitution of the United States or statute of the United States (28 U.S.C. §1331): Constitution, Article_____, Section_____; Statute, US Code, Title_____, Section_____.

☑   2.   This case arises because of violation of the civil or equal rights, privileges, or immunities accorded to citizens of, or persons within the jurisdiction of, the United States (28 U.S.C. §1343).

☑   3.   Other grounds (specify and state any statute which gives rise to such grounds):

18 USC 1962(c)(d) RICO and conspiracy

Kansas Consumer Protection Act and conspiracy

Personal injury, breach of contract, tortious inter

ference with contract, civil rights act 1981-1988

III.    Statement of Claim:

(State here a short and plain statement of the claim showing that plaintiff is entitled to relief.   State what each defendant did that violated the right(s) of the plaintiff, including dates and places of such conduct by the defendant(s).   Do not set forth legal arguments. If you intend to allege more than one claim, number and set forth each claim in a separate paragraph.   Attach an additional sheet, if necessary, to set forth a short and plain statement of the claim[s].)

The defendants conspired from January 9th, 2014 through the present to conceal

and obstruct justice with respect to the OnForce Insurance Enterprise as describe

in Sullivan v. WorkMarket, et. Al.

Defendants breached contracts and interfered with incited breach of contract for

medical and disability benefits; obstructed justice, wire and mail fraud, et. al.

IV.    Relief:

(State briefly exactly what judgement or relief you want from the Court.   Do not make legal arguments.)

Seeking declaratory judgment that the OnForce enterprise was illegal, that all

attorneys, doctors, and judges involved were aware of the illegality; and concealed

evidence and intimidated victim; damages, punitive damages, and penalties >$2M

V.      Do you claim the wrongs alleged in your complaint are continuing to occur at the
present time? Yes [X]      No [ ]

VI.     Do you claim actual damages for the acts alleged in your complaint?
        Yes [X]      No [ ]

VII.    Do you claim punitive monetary damages?   Yes [X]   No [ ]

If you answered yes, state the amounts claimed and the reasons you claim you are entitled
to recover money damages.

Seeking damages in excess of $750,000 treble; plus in excess of $2 million puniti

punitive damages and penalties. The KCPA affords penalties and enhanced civil

nalties of up to $20,000 per day for ongoing violations. The violations in this case

intentionally interfered with medical care for crippling spinal injuries of which all

were aware; and which OnForce and The Hartford stipulated liability in 8/2012

before surgery was determined necessary; aftr which all conspired in fraud, breac

VIII.   Administrative Procedures:

A.      Have the claims which you make in this civil action been presented through any type of Administrative Procedure within any government agency?
Yes ☒   No ☐

B.      If you answered yes, give the date your claims were presented, how they were presented, and the result of that procedure:

Department of Labor ALJ Kenneth Hursh declined jurisdiction on fraud

allegations 8/13/2014. Kansas Insurance Commission declined intervention

wcalling it work comp without investigation solely because a offer was mad

C.      If you answered no, give the reasons, if any, why the claims made in this action have not been presented through Administrative Procedures:

_____

_____

_____

IX.    Related Litigation:

Please mark the statement that pertains to this case:

☑       This cause, or a substantially equivalent complaint, was previously filed in this court as case number _____ and assigned to the Honorable Judge Vratil_____.

☐       Neither this cause, nor a substantially equivalent complaint, previously has been filed in this court, and therefore this case may be opened as an original proceeding.

_Scott B Sullivan_
_____
Signature of Plaintiff

Scott B. Sullivan
_____
Name (Print or Type)

7214 W 71st Terr, Overland Park, KS
_____
Address

Overland Park, KS 66204
_____
City               State               Zip Code

                        (913) 636-8271
_____
Telephone Number


### DESIGNATION OF PLACE OF TRIAL

Plaintiff designates { ☐ Wichita,  ☒ Kansas City , or  ☐ Topeka} , Kansas as the
                                        (Select One)
location for the trial in this matter.

_Scott B Succ_
_____
Signature of Plaintiff


### REQUEST FOR TRIAL BY JURY

Plaintiff requests trial by jury { ☒ Yes or  ☐ No  }
                                        (Select One)

_Scott B Cell_
_____
Signature of Plaintiff


Dated: _____
   (Rev. 10/15)

1) Dr. David Clymer, 10777 Nall Ave #300, Overland Park, KS 66211

2) CARONDELET ORTHOPAEDIC SURGEONS A DIVISION OF SIGNATURE MEDICAL GROUP OF KC, PA 10777 NALL AVENUE, SUITE 300 OVERLAND PARK, KANSAS 66211ADDITIONAL PARTIES

3) Dr. Edward Prostic, 2301 Holmes St, Kansas City, MO 64108Phone: (816) 404-1000

4) Dr. Prostic's practice name

5) Johnson County Imaging Radiologist

6) Johnson Count Imaging

7) John M. Graham, Jr. 7400 College Blvd. Overland Park, KS 66201

8) Steven G. Piland, 7400 College Blvd. Overland Park, KS 66210

9) The Steven G. Piland Law Firm, 7400 College Blvd. Overland Park, KS 66201

10) Melinda Young

11) Matthew Bretz 3 Compound Dr, Hutchinson, KS 67502

12) The Law Firm of Bretz & Young – c/o 2500 Hawthorne, HUTCHINSON, KS 67502

13) Tim Elliot

14) Elliot Law Firm

1

15)      Administrative Law Judge Kenneth Hursh c/o Kansas Department of Labor, Workers Compensation Division 401 SW Topeka Blvd. Topeka, Kansas

16)      Special Administrative Law Judge Jerry Shelor c/o Kansas Department of Labor, Workers Compensation Division 401 SW Topeka Blvd. Topeka, Kansas

17)      The Law Firm of McAnany, Van Cleave and Phillips 10 East Cambridge Circle Drive, Suite 300 Kansas City, KS 66103 (913) 371-3838

18)      Greg Goheen 10 East Cambridge Circle Drive, Suite 300 Kansas City, KS 66103 (913) 371-3838


19)      These defendants have crippled me for life because I filed a workers compensation claim. That includes all of the defendants in all of my cases who retaliated against me for no other reason than becuae I got injured at work and filed a workers compensation claim.


20)      But the defendants directly involved in the OnForce, The Hartford, and Berkshire Hathaway's frauds were the worst; because they all knew that I was defrauded by OnForce, and should never have been forced to file a workers compensationclaim in the first place.

2

21)     I even begged my attorney to get me OUT of the work comp court; and instead she conspired with opposing counsel and even the judge to keep me in the work comp court, where OnForce and The Hartford could maintain complete control over my medical care and use the denials of medical care to attempt to extort global settlement release in the amount of only $6001 and with no future medical care for a permanently crippling spinal injury which has left me unemployable for the rest of my life.

22)     These are images of the cysts and herniated discs on my spine from my most recent MRI taken in May of 2020:

23)     These are the images of the cysts that I finally got in May of 2020 from AdventHealth, but only after being exceedingly persistent in demanding that they perform the PROPER MRI of the sacrum, including coronal views. It took multiple visits to my primary physician and to AdventHealth's Radiology department to even get them to do the correct MRI. And in my most recent trip to Menorah ER, they too refused to do the correct MRI. So it is not small feat to get an MRI that so clearly demonstrates the damage caused by Tarlov Cysts inside the sacrum.



24)

25)     A quick note about MRI imaging, and how it works. MRI images are

all 2 dimensional. Collectively, they can form a 3D image with specialized

software. But each individual image is purely 2D. So, in the center of this

image, where it looks like the large cysts might be going infront of the two

nerve roots adjacent to it…it is not going "in front of" anything". These

nerve roots are all on the same plane. The cyst is crushing the two adjacent

nerve roots. And this is in its smallest, undilated size. When I've been sitting

upright, or doing anything upright, that cyst gets bigger, crushes those nerve

roots even more. And that is what cause my daily escalations of symptoms

even from sedentary work like typing.



26)

27)    And this even larger cysts on the right side (left side of the image) is

barely discernable as to its true size in a sagital image, because it is being

displaced  and pushed horizontally. When it dilates after sitting upright, it

causes the severe tremors and uncontrollable spasms in my leg and the

intermittent paralysis in my right foot.



28)

29)     And finally, this image shows the extreme degradation of my L5-S1

lumbar disc. This is not "degenerative disc disease." This is the result of an

untreated spinal trauma, which doctors now wrongly call "degenerative"

because it has gone untreated for ten years.

30)     Even a lay person can look at these images and see that my spine is

NOT at Maximum Medical Improvement; nor did anyone expect that it

would be after ten years of intentional litigation abuse and a relentless string

of frauds committed to prevent me from getting medical care.

31)     But it would have taken HONEST medical experts to diagnose these

cysts and recommend the appropriate treatment; and honest medical experts

is something that I never received from OnForce and The Hartford.

32)     And as the behavior of the attorneys and judges involved in this case demonstrates; including their hiring of two doctors who agreed to perform incomplete and non-AMA compliant exams and to create fraudulent medical records and to conceal the Tarlov Cysts and other findings from me and from the court; litigation abuse and withholding of medical care as leverage to force and extort settlements is considered normal behavior by attorneys and by the judges who fail to regulate their behavior.

33)     In this case, though, the judges went behond not regulating the behavior of the attorneys; and participated directly in the frauds committed by the attorneys in defense of what turned out to be a patently illegal scheme of nationwide insurance and labor racketeering.

34)     While these cysts and herniated discs cause such extreme pain and incapacity that I cannot complete legal pleadings, motions and briefs anywhere near the standards expected from attorneys and even from able-bodied pro se litigants; I was not always as disabled as I am today.

35)     This is the normal progression of an untreated spinal injury; and particularly with Tarlov Cysts which develop their symptoms slowly and incrementally over time.

36)     The Kansas Workers Compensation Act allows for an injured worker to seek future medical care as additional pathologies and symptoms arise;

even if a case has been ruled upon previously. SO long as a person has not waived future medical by settlement, the claim can be reopened to provide care for future pathologies discovered, or even to repair defective surgical procedures.

37)     But in this case, the defendants along with the health care providers, including my own privately selected health care providers who were just so vehemently opposed to workers compensation and to treatment of Tarlov Cysts, delayed my care for so long that they withheld the diagnostic information that I needed until OnForce had been sold twice..l.once in 2014 and again in 2017.

38)     And still to this day, the medical expert testimony is being withheld due to the alleged criminal conspiracies to cover up Tarlov Cyst Disease itself…an entirely unbelievable but true allegation that can be confirmed by everyone with a simple phone call to Reta Honey-Heirs of The Tarlov Cyst Disease Foundation.

39)     I have made dozens of videos documenting exactly how much pain I endure while attempting to write legal pleadings and briefs.

40)     But I should never have been forced to compete against criminally minded lawyers and judges simply to get medical care in the first place.

41)      I had insurance the entire time, private health insurance underwritten

through Coventry. And I had the human right to control my own medical

care; and not to have control of my medical care put into the hands of a

psychopath like John M. Graham, Jr. in the first place.

42)      It is only because Mr. Graham has chosen to make it his profession to

withhold medical care from critically injured people for profit that OnForce,

The Hartford, and Berkshire Hathaway's frauds continued even after I

obtained legal representation.

43)      But there was not then, nor is ther now, any reasonable or honest

dispute that I need medical care despearately to prevent these disabilities

from becoming permanent, if it is not too late already.

44)      And that requires removing all of the slanderous material that has

been published and used against me; including most urgently removing the

slanderous medical records created in conspiracy with Mr. Graham and even

with my own attorney Melinda Young and my judge, ALJ Kenneth Hursh.

45)      All of the above named defendants are alleged to have participated in

the cover up of the OnForce, Inc. workers compensation and insurance

frauds alleged herein referred to as "The OnForce Insurance Enterprise"

46)      The factual background is scattered and incomplete with much

repetition that I just cannot physically endure the task of completing and

correcting.

47)      I am pleading equitable estop0pel, equitable tolling, and statutory

tolling under K.S.A. 59-515 as to all statutes of limitations defenses.

48)      My disabilities continue to escalate; including escalating severely in

the nearly four years since I first sought relief from the health caree

providers, family and church members who interfered with my medical care

and benefits.

49)      Every defendant in every case, and every defendant in this case was

aware of the damage to my spine, as it was imaged on MRIs performed at

the request of The Hartford as early as April 3rd, 011.

50)      This includes the early formation of the Tarlov Cysts, which are

visibly larger an impinging adjacent nerve roots in my most recent imaging

performed on May 2020.

51)      It took me almost six years to fully learn about Tarlov Cysts AND to

get a radiologist to perform the proper MRI imaging, as recommended by

the Tarlov Cyst Disease Foundation. This was alleged in my first filed cases

as the conspiracy to conceal Tarlov Cysts, and to provide disparate access

and benefits from health care services to people with Tarlov Cysts; resulting

in the disenfranchisement from all medical care and irreparable defamation, including defamation included by doctors in our medical records.

52)      My Tarlov Cysts were first disclosed to me on October 15th, 2014.

53)      Two months to the day later, on December 15th, 2014, I was threatened with murder and specifically told to drop my claims against OnForce, The Hartford, and Berkshire Hathaway.

54)      It is the claims against OnForce, The Hartford and Berkshire Hathaway, herein referred to as "The OnForce Insurance Enterprise" which these defendants directly obstructed through their acts and practices deceptive and unconscionable acts and practices and various frauds during the entire pendency of my workers compensation case in the Kansas Department of Labor's Workers Compensation Court.

55)      And it was immediately after I requested deposition testimony and additional medical care from Dr. Clymer, Dr. Prostic, and John M. Graham, Jr. respectively that the threat of murder was delivered to me.

56)      Among the evidence which will be admitted is the confirmation of my disabilities by The Hartford's own chosen doctors, Dr. Wakwaya and Dr. Ciccarelli; and the only series of AMA compliant disability evaluation that I received from Dr. Azevedo in September and October of 2014; plus evaluations from other health care providers, mental health providers, and

lay witness testimony of my escalating disabilities over the entire previous ten years.

57)     Uniquely in this case, as described below (in admittedly poor writing and organization), both opposing counsel, my attorney, and the administrative law judges were aware of the fraudulent nature of the OnForce/Hartford/Berkshire Hathaway insurance enterprise.

58)     Melinda Young even explicitly instructed me not to accept the Nebraska Furniture Mart settlement demands in a debt collection case which was being used as leverage to extort global settlement releases that would indemnify all Berkshire Hathaway companies; including United States Liability Insurance, Wessco, and Nebraska Furniture Mart for all claims. This was Ms. Young's own interpretation of those demands; which was exactly what I feared those demands meant as written.

59)     And as will be shown from the documentation provided to me by Ms. Young in July of 2014, she was aware of and in possession of the evidence which proved OnForce et. Al's. Frauds months before she moved to withdraw from my case; yet she still insisted that I allow her to pursue the case in the workers compensation courts.

60)     And as will also be demonstrated, Ms. Young, Mr. Graham, Ms. Young and ALJ Kenneth Hursh were all aware of the impending sale of

OnForce to Adecco long before it was publicly announced for the first time on August 11th, 2014; and they not only concealed that information from me; but conspired to bring a detrimental close to my case through additional frauds, and especially through the fraudulent medical services which they arranged through Dr. Clymer and Dr. Prostic.

61)      It is alleged that Ms. Young was aware that the pending sale to Adecco would make any relief beyond the workers compensation courts nearly impossible to achieve; and that the evidence which she had acquired would lead to the workers compensation court denying jurisdiction if it were brought to light. Ms Young chose to join in the active concealment; and to subsequently perjure herself in support of her Motion to Withdraw.

62)      I was advised by multiple attorneys of the potential for claims against Ms. Young; but none would take the case in light of the involvement of the State and particularly ALJ Hursh

63)      In case I forgot to type it below; on August 13th, 2014, after the hearing on Ms. Young's Motion to Withdraw, and after the surprise Preliminary hearing was called for argument and presentation of evidence (none of which Ms. Young had filed, even though she arranged not to be present when that Preliminary hearing was to be called to order by the court); administrative Law Judge Kenneth Hursh ran down a flight of stairs

13

from the second floor of the ANB Bank Building at which the hearings were held, purportedly to hold the door as I left along with my wife, Michelle Safford; and as I rolled past him in my wheelchair, he reached out his leg and kicked me in the shin then ran back into the building and almost all the way back to the stairs before I could even turn around and yelled "That is assault."

64)     ALJ Hursh then filed a false police report alleging that I had swung my wheelchair into him, which you can clearly see and hear from the audio recording of the incident was not true. And Mr. Graham, gave a false statement to the police of the events of the day. Together, the assault and the false police report ensured that no attorney would ever represent me in these claims again. Many specifically stated that they would not represented me specifically because of the assault allegation filed by Hursh and supported by Graham on August 13th, 2014.

65)     That would not have happened if my attorney had even been ther. And even if she had filed her evidence that the OnForce Hartford Berkshire Hathaway enterprise was fraud; I would have been able to seek counsel from other attorneys, or even proceed as a pro se long before my disabilities escalated to their current life threatening and almost completely incapacitated state.

14

66)     The poor quality of all of my writing is entirely due to the pain and

fear that have been inflicted upon me specifically to cover up the OnForce

Insurance Enterprise and the involvement of all of the named defendants in

each and every one of my cases.

67)     And as I will further demonstrate, these are all trained tactics;

including withholding medical care as leverage; and explicitly these tactics

were trained to my personal claims adjusters at The Hartford by attorneys

from the law firm of McAnany, Van Cleave and Phillips via their annual

workers compensation seminars, such as the one that I attended and recorded

on August 6th, 2014.

68)     And as I will only be able to complete sparse and incomplete

pleadings at this time; I must note that when my family chose McAnany,

Van Cleave and Phillips as their attorneys, it was specifically *because* I had

informed my family of the training provided by MVP law to The Hartford,

and of MVPs proudly displayed abusive and arguably illegal litigation

tactics. My family chose MVP law specifically because they knew that MVP

law and particularly Greg Goheen would do anything and everything

possible to protect The Hartford from liability for their involvement in the

OnForce racketeering schemes.

15

69)	And I meant to mention this above: I am certain from my contacts

with multiple attorneys as well as from the disputed rulings of this court in

other cases that Melinda Young was aware of this truth: that Federal judges

hate being involved in workers compensation cases; always presuming that

the claim is based upon nothing more than the injured worker being

dissatisfied with the outcome of the claim. This "you're just dissatisfied"

argument has been raised consistently including by ALJ Hursh and Mr.

Graham, including by current U.S. District Court Judge and former member

of the Kansas Supreme Court's Accss to Justice Committee Gwynn Birzer,;

and I have read it countless times in case law and scholarly articles. It is a

nearly insurmountable presumption that workers compensation related

claims which arrive in the Federal courts are "sour grapes" and that workers

compensation is an exclusive remedy for everything related to a work place

injury.

70)	But this case is different, because it isn't even legitimate workers

compensation insurance; and the overall pattern of wire and mail fraud

between OnForce, The Hartford, and Berkshire Hathaway goes back many

years before the public rollout of the OnForce scheme in April of 2011; and

variations on the same racketeering schemes continued at OnForce

subsequent to the purchase by Adecco and the later purchase in August of

2017 by WorkMarket. In other words, these frauds transcend three

ownerships of OnForce; I was the first person injured so severely as to

require surgical intervention; and the conspiracy to cover up these claims

resulted in ten years and counting of similar practices at every iteration of

OnForce's insurance schemes.

71)     The simple admission by anyone at any time that I was defrauded

would have restored control of my medical care to me; and would have

allowed me to use my private insurance to receive the proper surgery as

early as August of 2012; and to receive treatment from the world's foremost

expert in Tarlov Cysts, Dr. Frank Feigenbaum, before he cloased his local

practice and moved to Dallas, TX; w I annot stress this urgently enough. The

world's foremost expert on Tarlov Cyst Disease was at St. Luke's South

Hospital, in the very same building where I first sought medical care before

control of my  medical care was illegally seized by OnForce and The

Hartford; and control of my medical care was illegally retained within the

DOL Workers Compensation Diviision, again, with their full knowledge

athat OnForce's practices were illegal and their full participation in covering

up that fact...

72)     And every fraudulent medical record created during that entire time is

still being used against me, as confirmed in my most recent interactions with

17

The University of Kansas hospital Authority in January and February of 2021 and with Menorah Medical Center in May of 2022.

73)     And I just want to add before I do a few final tasks and file this that it is not just the physical disabilities which are crippling me. I also suffer extreme chronic sleep deprivation, and sheer terror at the fear of retaliation, plus major depressive disorder due to the complete hopelessness of attempting to restore my rights as a pro se litigant being so severely disabled and so overwhelmed by the sheer number of people who maliciously hurt me and the relentlessly abusive litigation tactics of all of the attorneys who represent them.

74)     It was always a strategy to withhold medical care and cripple me to force Global Settlement Releases. The Law firm of McAnany, Van Cleave and Phillips taught that at the break out session titled "Global Settlement Releases" taught by Greg Goheen (along with three other attorneys), and it is common knowledge and common tactics throughout the workers compensation industry.

75)     These tactics went too far with me; because the frauds that they were covering up were far more significant than a single workers compensation claim. And there is not a single defendant named who is willing to even tell the truth, or even admit the truth of Tarlov Cyst Disease, even when they see

the cysts crushing the nerve roots so undeniably that even alay person can literally see my pain.

76)     I have also been diagnosed with Obsessive Compulsive Personality disorder, and debatably diagnosed with schizophrenia and possibly psychosis; though none of these diagnoses predate the facts alleged in these cases. OCPD in particular is not OCD, it is a different disease altogether, and the defining characteristics include crippling perfectionsism. This does not mean that you do things perfectly (That is more OCD). It means that you can't do things at all because they are too complex and cannot be done perfectly; .

77)     Litigation abuse is perhaps the worst thing possible for aggravating OCPD, depression and anxiety that have been caused by these defendants.

78)     I am also completely alone, with no support, as my wife, Michelle Safford, abandoned me in December of 2015 specifically as a result of the threats to murder and my unwillingness to drop my claims; particularly as I had just found out about the cysts and expected at that time to have a full diagnosis and be on my way to a curative surgery literally within mere months, before I was threatened with murder; and before I learned of the complex and unbelievable denial of Tarlov Cyst Disease itself.

COUNTS

79)    Dr. David Cymer and Corondolet Orthopedic Surgeons were

contracted to perform a medical examination on July 14th, 2014 to assess my

level of disability and recommend treatment.

80)    Dr Clymer and Corondolet are alleged to have breached the contract

by refusing to perform the specified services; and instead performing only a

limited evaluation for the explicit purpose of estimating the likelihood that

the specific surgery recommended by Dr. Ciccarelli in August of 2012

would restore me to Maximum Medical Improvement.

81)    Kansas law and common law recognize that health care providers are

suppliers and patients are consumers, and the contract between the parties

exists as a discreet contract.

82)    The contract to perform medical services was explicitly a contract

between myuself and Coronodlet Health and Dr. David Clymer; with the

anticipation that the services would be apaid for by The Hartford/Twin

Cities Fire Insurance. And the contract in this case was to be a contract for

specific services necessary for the furtherance of a workers compensation

clim. Those services include a functional impairment analysis and

recommendations for treatment and testimony and depositions to be

provided for the adjudication of the workers compensation claim. This is a

20

distinctly different set of services from a normal doctors' visit (with the additional deposition testimony for example, being expected from a work comp doctor which would not be a normal part of the contract with a traditional doctors' visit.) The expected services are also distinctly different from what was provided, which was an explicit refusal on the day of service to perform the full examination or to recommend treatment options.

83)     Dr. Clymer was very specific in saying that he "was not being paid enough money" to do a full examination as was expected; and this was reflected in the written medical report as well.

84)     Dr. Clymer was contacted by telephone in December of 2015 to requet that he give deposition testimony, and his staff informed me that he would not give depositions to a pro se litigant; and that I needed to have my attorney contact their office to schedule testimony.

85)     Dr. Clymer and Corondolet also ultimately billed me for the services, claiming that The Hartford refused to pay them; and they demanded payment from me. This emphasizes the fact, often misunderstood, that even in workers compensation, the contract is between the doctor and the paitent; not between the doctor and the insurer. This is also standard with all health insurance based health care services. If the insurance company refuses to

pay, the health care provider collects from the patient. The patient is the party ultimately responsible, and thus the party to the contract.

86)     Dr. Clymer is also alleged to have been aware that I had private health insurance; and that I was forced into the workers compensation systemand kept in the workers compensation system against my will and wishes. At the time that Dr. Clymer performed the limited services that he had prearranged with opposing counsel John M. Graham, Jr. and The Hartford, and at the time that he completed and submitted his falsified (allegedly) opinion which was formed in the absence of full examination,Dr. Clymer was knowingly and intentionally interfering with private health insurance contract between myself and Coventry for the payment of medical expenses and for the discounting of medical expenses versus the full "list" rates that Dr. Clymer eventually billed me.

87)     This is also alleged to have been a deceptive and unconscionable act as I was incited into the contract through false pretenses of a complete examination; and the resulting medical records were created on the basis of intentionally omitted diagnostics for a limited and allegedly to further OnForce and The Hartford's frauds against me.

88)     Dr. Clymer's opinion expressed on the basis of this fraudulent examination has been used, and is still being used as a part of my medical

history to prevent me from getting the benefits of private health insurance and privately contracted health care services

89)     Dr Clymer has distributed these false medical records via wire and mail on multiple occasions, which will be itemized for the court at a later date; but which are all within the knowledge of Dr. Clymer and Corondolet on the basis of their own records of communications to other health care providers via HIIPPA requests for records.

WHEREFORE IN COUNT I Dr. Clymer and Carondelet are alleged to have breached their contracts for the services promised on July 14th, 2014;

In Count II, Dr. Clymer and Carondelet are alleged to have interfered with contracts for insurance benefits and for medical services from all subsequent health care providers with whom Dr. Clymer and Carondelet communicated.

In Count III Dr. Clymer and Carondelet are alleged to have interfered with the contracts for medical services and workers compensation benefits between myself and OnForce; or in the alternative between OnForce and Twin Cities Fire Insurance for the payment of workers compensation benefits and medical expenses.

In Count IV, Dr. Clymer and Carondelet are alleged to have violated the Kansas Consumer Protection Act by inciting me to contract via false pretenses and promises which were prearranged to be violated.

In Count V, Dr. Clymer and Carondelet are alleged to have conspired with The Hartford, OnForce, Twin Cities Fire Insurance, John M. Graham, Jr., Melinda Young, and the Stephen G. Piland Law Firm and The Law Firm of Bretz and Young to further the racketeering enterprise referred to herein as "The OnForce Insurance Enterprise."

In Count VI I am seeking all relief to which I may be entitled whether asked for in my pleadings or not; pursuant to FRCP 54(c) and reserve the right to amend the pleadings at any time so as to do justice.

90)     Dr. Edward Prostic was contracted to perform a full functional examination and to recommend treatment options and provide treatments in fulfillment of the promises of The OnForce Insurance Enterprise.

91)     Dr. Edward Prostic was chosen by opposing counsel John M. Graham, Jr. of The Steven G. Piland Law firm and Twin Cities Fire Insurance and the claims adjusters at The Hartford.

92)     The contract for medical services was between myself and Dr. Prostic and his parent organization.

93)     When Twin Cities Fire Insurance and The Hartford refused to pay for

Dr. Prostic's services, Dr. Prostic billed me for the services, as is standard in

contracts between health care providers and patients.

94)     Dr. Prostic was contacted in December of 2015 after I was informed

that I have Tarlov Cysts and asked to give deposition testimony; and dr.

Prostic refused, stating that he only gives testimony to attorneys.

Dr. Prostic was aware that I was a pro se litigant both at the time of his

services and at the time that he refused to give deposition testimony.

95)     Dr. Prostic performed only a physical examination, and did not

perform the examination or his evaluation according to the AMA guides; as

is required for a workers compensation specific examination. Dr. Prostic was

at all times aware that the purpose of the examination was for documenting

my level of disability and for recommending and providing treatment

options to restore me to Maximum Medical Improvement.

96)     Dr. Prostic performed a series of x-rays which would be of no benefit

for the diagnosis of nerve damage and neurological symptoms such as those

that I was reporting.

Dr. Prostic also claimed to have reviewed prior medical records, presumably

including medical imaging; and made no mention of the Tarlov Cysts which

were contributing to the majority of my symptoms and disabilities.

97)    Dr. Prostic is alleged to have prearranged with John M. Graham, Jr.
The Hartford and Twin cities Fire Insurance to perform only a limited subset
of the contracted services; and yet billed me the full amount for his services
when The Hartford, Twin Cities and John M. Graham Jr. refused payment.

98)    Dr. Prostic refused to provide deposition testimony, which is a
required element of workers compensation medical and expert witness
services.

99)    Dr. Prostic was aware that I also had private health insurance; and is
alleged to have been aware both before he performed the limited
examination and before he created medical records for distribution to other
health care providers which he knew included false and incomplete
diagnostics.

WHEREFORE

In Count VII Dr. Prostic and his parent organization are alleged to have breached
their contracts for the services promised on July 14th, 2014;

In Count VIII Dr. Prostic and his parent organization are alleged to have interfered
with contracts for insurance benefits and for medical services from all subsequent
health care providers with whom Dr. Clymer and Carondolet communicated.

In Count IX Dr. Prostic and his parent organization are alleged to have interfered with the contracts for medical services and workers compensation benefits between myself and OnForce; or in the alternative between OnForce and Twin Cities Fire Insurance for the payment of workers compensation benefits and medical expenses.

In Count XI, Dr. Prostic and his parent organization are alleged to have violated the Kansas Consumer Protection Act by inciting me to contract via false pretenses and promises which were prearranged to be violated.

In Count XII, Dr. Prostic and his parent organization are alleged to have conspired with The Hartford, OnForce, Twin Cities Fire Insurance, John M. Graham, Jr., Melinda Young, and the Stephen G. Piland Law Firm and The Law Firm of Bretz and Young to further the racketeering enterprise referred to herein as "The OnForce Insurance Enterprise."

In Count XIII am seeking all relief to which I may be entitled whether asked for in my pleadings or not; pursuant to FRCP 54(c) and reserve the right to amend the pleadings at any time so as to do justice.

100) Johnson Count Imaging performed the original MRI ordered by Dr. Wakwaya of Concentra on April 3rd, 2012 and used by Dr. John Ciccarelli in his evaluation leading to his recommendation of surgery in August of 2012.

101)     The contract for medical services was between myself and Johnson County Imaging, with The Hartford and Twin Cities Fire Insurance to pay the expenses.

102)     As described more fully below, Johnson County Imaging destroyed the original MRI imaging data after I requested a reread to report all Tarlov Cysts Found. The destruction of the MRI images was revealed to me on August 12th, 2012 when I went to pick up a reread and a report that included the Tarlov Cysts that were found.

103)     Only much later did I discover a backup copy of the MRI CD from April 3rd, 2012. (I had ten copies of every CD, all of which went missing when Michelle Safford left in January of 2016. The imaging from April 3rd, 2012 does show the Tarlov Cysts in their earlier stages of formation, much smaller than they appear today.

104)     While discussing the recent finding of Tarlov Cysts with two of the radiologists, one of them commented that they see Tarlov Cysts all the time. At that point, I still did not know about the broad based conspiracy between neurological surgeons and orthopedic surgeons and radiologists to conceal findings of Tarlov Cyst Disease from patients.

105)     As with all health care contracts, the contract is between the health care provider and the patient; and my contract with Johnson County Imaging

was to disclose all relevant findings; which would include the finding of the Tarlov Cysts in their earliest stages.

106)     I allege that Johnson County Imaging intentionally destroyed the MRI images when they were made aware by that I was seeking additional medical care and expenses based upon findings that JCI had omitted from their reports as a part of the broad-based conspiracy to conceal Tarlov Cyst Disease, obstruct medical care, insurance benefits (including workers compensation and medical malpractice damages) .

107)     Because the concealment of Tarlov Cyst is an intentional concealment, broad based, and not founded upon any published medical science; this was a deceptive and unconscionable business practice to conceal the cysts initially; and an act of obstruction of workers compensation claim, medical malpractice claims, and ADA claims upholding the right to be informed of all findings, and particularly Tarlov Cysts. In other words, it was not a negligent omission; and thus not covered under common law definitions of medical malpractice.

WHEREFORE, IN COUNT XIV I am seeking declaratory judgment and damages and injunctive relief that Johnson County Imaging and the radiologist assigned to my case and the unknown employee who deleted the MRI imaging in August of 2016 conspired and participated in the racketeering enterprise to deprive me of

medical care and benefits in the OnForce Insurance Enterprise by creating, publishing, disseminating and destroying medical records necessary to secure medical care and rights to relief.

In Count XV that Johnson County Imaging violated the ADA by withholding the diagnosis of Tarlov Cyst Disease on the basis of business decisions and without supporting medical science, thus creating a disproportionate impact upon Tarlov Cyst Patients and discriminationg against patients on the basis of Tarlov Cyst Disease.

In Count XVI am seeking all relief to which I may be entitled whether asked for in my pleadings or not; pursuant to FRCP 54(c) and reserve the right to amend the pleadings at any time so as to do justice.

I am seeking damages and declaratory judgment under the ADA for disparate impact and discrimination against people with Tarlov Cyst Disease.

I am seeking personal injury damages for the initial withholding of the findings of Tarlov Cysts; and for the ongoing harms suffered as a result of the destruction of evidence of the original imaging.

I am seeking breach of contract damages

I am seeking tortuous interference with contracts for intentionally interfering with the contract for medical care and benefits between myuself and OnForce; or in the alternative damages resultant from the interference with the contract between OnForce and Twin Cities Fire Insurance for the payment of medical bills.

I am alleging conspiracy with and participation in the OnForce Insurance Racketeering

1) John M. Graham Jr., Melinda Young,Tim Elliot, Administrative Law Judge Kenneth Hursh, and Special Administrative Law Judge Jerry Shelor conspired between January 9th, 2014 and the present to conceal all relevant facts and evidence and interfere with contracts and obstruct justice with respect to the OnForce Insurance Enterprise, as described more fully herein.

2) John M. Graham, Jr. is an employee of The Steven G. Piland Law Firm.

3) The Steven G. Piland Law Firm is a whooly owned subsidiary of The Hartford, and a sister organization to Twin Cities Fire Insurance.

4) Mr. Graham was notifed on or about January 9th, 2014 by Melinda Young of the law firm of Bretz & Young that she had filed with the Kansas Department of Labor workers compensation division seeking medical care and disability benefits as my counsel.

5) From January 2014 through January of 2015 Mr. Graham communicated directly with my attorney, Ms. Young in the litigation of my workers compensation claim.

6) These communications included Mr. Graham writing the entire response brief in my appeal of Ms. Young's Motion to Withdraw; and Ms. Young joining Mr.Graham's arguments without writing any of her own.

7) Ms. Young also never filed the required affidavits, and engaged Tim Elliot to provide slanderous, perjurous, and hearsay testimony on her behalf at the August 13th, 2014 hearing before Judge Kenneth Hursh.

8) Ms. Young provided her own slanderous and perjurous testimony at the November 2014 rehearing before Judge Jerry Shelor.

9) While I was provided with a large collection of communications via emails between Ms. Young and Mr. Grham subsequent to her withdrawal hearing; Ms. Young withheld critical documents, including Mr. Graham's response to my request for copies of all relevant insurance contracts.

10)   Notably, in one of the documents, the purported OSHA accident report, the form lists no named insurer, and a policy number of "75POLDUMMY". Based upon this document, which was provided to me by Ms. Young, it is the only reasonable inference that she was aware that there was no workers compensation policy under which I, as a sole

proprietor and customer of OnForce could legally be sold the right to coverage under OnForce's corporate workers compensation policy.

11)      OnForce was a company with 50 office employees which provided no onsite services as any part of their core business. It was admitted by WorkMarket as successor to OnForce that they operate the same business model; which is that of a software as a service provider.

12)      Allegedly, when Ms. Young received these documents from OnForce and became aware of the lack of valid insurance and the likelihood of broad-scale nationwide racketeering (interstate wire and mail fraud in the offer and sale of insurance coveregae (not insurance, but coverage under the corporate policy) that was when she finally decided to contact me on May 7th, 2014; at which time she asked me a series of questions that I had already answered for her partner, Matthew Bretz before they agreed to take my case, about the nature of my relationship with OnForce. Ms. Young insisted that there was a legitimate workers compensation insurance policy and claim; refused to request copies of such policies; and suggested that I needed to seek a different attorney if I wanted to pursue that route. And I responded by telling her that she couldproceed with the case in any manner that she saw fit. She did NOT at any point agree with my assessment; and insisted that

pursuing benefits through the workers compensation court was the correct strategy.

13)    We had a near identical telephone call on May 27th, 2014; at which point Ms. Young informed me that OnForce and Twin Cities Fire Insurance by and through John Graham had agreed to provide me with medical care; In a later email, she informed me that I would be seen by and that I would be seen by Dr. David Clymer on July 14th, 2014.

14)    I attended my appointmenjt with Dr. Clymer, at which he refused to perform full examinations or recommend treatment; stating that he was "not being paid enough money" for the full service; as described more fully below. I requested that he perform the full service, stating that I was his patient and his duty was owed to me personally; which he disagreed with, insisting that he had only agreed to a more limited examination with my attorney, Melinda Young and opposing counsel John M. Graham, Jr.

15)    The day after my appointment with Dr. Clymer, I was writing an email to Ms. Young when I received her email and a Motion to Withdraw from my case; which she had apparently filed on July 14th, 2014, mere hours after my examination had completed.

16)    Note the pattern, that Ms. Young filed a Motion for Preliminary hearing on August 11th, 2014 at 4:20 am.; only 30 minutes after OnForce

was sold to Adecco; but she did not inform me that the Preliminary hearing would be held two days later on August 13th, 2014.

17)   The Preliminary hearing was sprung upon me by surprise at John M. Graham,Jr.s request and with the agreement of Judge Kenneth Hursh. When I objected because my attorney had just moments earlier been released from her contract, and she was not even present, having sent Tim Elliot in her place; Judge Hursh harshly said that I could have his copy of the Motion for Preliminary hearing and tossed it on my desk.

18)   The Motion for Prelminary hearing purportedly filed by my attorney, Melinda Young had a fax stamp on the top showing it was faxed at 4 in the morning immediately after the sale of Adecco concluded.

19)   Note also that the Motion for Withdrawal was originally scheduled for July 31st, 2014; but Ms. Young requested that it be reschedududled for August 13th, 2014; allegedly to delay the hearing until after the sale of OnForce to Adecco was concluded.

20)   Allegedly, everyone knew that OnForce was being sold to Adecco on August 11th, 2014, including John M. Graham, Jr. Melinda Young, and Administrative Law Judge Kenneth Hursh. Mr. Elliot may not have known, as according to his own account, he was only hired by Ms. Young on August 11th, 2014; and he had barely reviewed the facts of my case.

35

WHEREFORE IT IS ALLEGED IN COUNT

Seeking damages, declaratory judgment and injunctive relief That John M. Graham, Jr. Melinda Young, and ALJ Hursh conspired  with OnForce and Twin Cities Fire Insurance and The Hartford (collectively parts of the OnForce Insurance Enterpriseto obstruct justice with respect to OnForce's and The Hartford and Berkshire Hathaway's interstate wire and mail fraud; and further conspired in multiple acts of witness intimidation, obstruction of justice with respect to The OnForce Enterprise's interstate wire and mail frauds with victims in all fifty states.

That Melinda Young breached her contract for legal services by failing to advise me of the frauds when she discovered the evidence via discovery from The Hartford and Mr. Graham.

That Ms. Young engaged in torious interference with contract with respect to the contract for workers compensation equivalent benefits between myself and OnForce; or in the alternative interfered with the contract for workers compensation insurance between OnForce and The Hartford to my detriment.

That Ms. Young violated the Kansas Consumer Protection Act by engaging in deceptive and unconscionable acts and practices against a protected consumer, entitling me to damages, civil penalties, enhanced civil penalties, and declaratory judgment.

That Ms. Young, Mr. Graham, Judge Hursh, and Mr. Elliot conspired with

OnForce Insurance Enterprise and its various member parties to commit and to

conceal deceptive and unconscionable acts in violation of the Kansas Consumer

Protection Act; seeking declaratory judgment, damages, and civil penalties and

enhanced civil penalties under the KCPA.

Seeking damages for personal injury.

Seeking damages for common law fraud.

21)

22)　　　Much of the factual background underlying these claims has been

　　　pleaded and is incorporated herein by reference in the related cases of :

　　　　a.　Scott B. Sullivan v. WorkMarket, et. Al.

　　　　b.　Scott B. Sullivan v. University of Kansas Hospital Authority, et. Al..

23)　　　Any additional details required or requested by the defendants will be

　　　provided promptly upon request, through amendments, affidavits, and

　　　discovery responses; and I will consent to extensions of time to file their

　　　answers to promote the efficient administration of justice.

24)　　　All of my disabilities, both physical and psychological, have been

　　　caused by the actions and inactions of these defendants in their perpetuation

and cover up of the frauds and fraudulent enterprise between OnForce, The Hartford and Berkshire Hathaway.

25)     Beginning on April 3rd, 2011, OnForce.com began a policy of charging service providers who used the OnForce.com website to contract with service buyers "insurance fees" totaling 4.9% per work order to be covered under the OnForce, Inc. insurance policies for errors and omissions, general liability, and workers compensation insurance.

26)     On January 9th, 2012 plaintiff, Scott B. Sullivan was injured while completing a work order contract between himself and Agilisys.

27)     Mr. Sullivan suffered a spinal injury (to be distinguished from a "back injury, as described below) when a cash register fell from a countertop while Mr. Sullivan was disconnecting the cables from the rear of the register.

28)     Suspecting this to have been merely a back strain, Mr. Sullivan laid down in the manager's office for an hour before completing the work (which was almost complete at the time of the injury) with assistance from the assistant manager of the Talbot's retail store at which the work was being performed.

29)     The work and injury occurred at the Talbot's store at Oak Park Mall in Overland Park, KS.

30)    The work order was offered and accepted entirely through the OnForce.com website.

31)    The injury was communicated to the Agilisys supervisor via telephone on January 9th, 2012 prior to completion of the work. The injury was also communicated to the manager and assistant manager of the Talbot's store in person; and the assistant manager of the Talbot's store assiste d with the lifting and packaging of the hardware being uninstalled and returned per the work order instructions.

32)    I am not any good at legal writing, which is why I worked as a low-level computer and network technician instead of as a professional attorney.

33)    Because I was a low level technician, my work required frequent heavy lifting, climbing of ladders, lifting, carrying, pulling etc. There is a document included in my workers compensation records that was provided to me by my attorney, Melinda Young, after she filed her Motion to Withdraw from my case which will document that my work required medium to heavy work.

34)    OnForce refused to provide accommodated light or sedentary work subsequent to my injury despite multiple requests.

35)    Mr. Sullivan sought medical care first through his private insurance (private health insurance underwritten by Coventry) at St. Luke's South

39

beginning on January 30th, 2012 when the pain had continued to escalate despite three weeks of rest during which I only performed one light-duty work order (a router swap at a McDonalds in Olathe, KS which had already been contracted and scheduled prior to my injury)

36)     Failure to complete a contracted work order was considered cause for banning a service provider from the OnForce.com platform.

37)     Hereinafter I will use the term "The OnForce Insurance Enterprise" to distinguish OnForce's new policy requiring insurance on all work orders and charging fees to service providers for coverage under OnForce's corporate insurance policies.

38)     The OnForce Insurance Enterprise included Twin Cities Fire Insurance (A division of The Hartford) in the role of workers compensation insurance underwriter and respondent, The Hartford in their role as claims adjusters, though they were advertised as the underwriters of the workers compensation insurance by OnForce.com; and United States Liability Insurance (A Division of Berkshire Hathaway), in their role in the creation of, operation of, marketing of, and cover up of the OnForce.com insurance frauds.

39)     An additional partner in the OnForce Insurance Enterprise was Wells Fargo, who are not named as defendants; because their role was in the sale

of alternative errors and omissions and general liability insurance…unrelated to the workers compensation component of The OnForce Enterprise in any way.

40)     In light of my extensive disabilities I considered it an inquiry reasonable under the circumstances that the attorneys representing all defendants in all cases would contact me with any questions or requests for documentation in advance of filing written responses or denials of fact. Denying factual allegations which are within their knowledge, or within their constructive knowledge, is alleged to be an ongoing practice of witness intimidation, obstruction of justice, and wire and mail fraud in which all of the defendants  and their attorneys have been engaged consistently since before my injury and subsequently being forced into the workers compensation system for access to medical care. To clarify: I believe that it is a standard practice for these defendants and their attorneys which predates my specific injury; and which they have continued in all of my related cases subsequent to my injury.

41)     The Kansas Consumer Protection Act makes it illegal to engage in deceptive and unconscionable acts and practices in the making of and enforcement of (including defense of) contracts between suppliers and consumers of goods and services.

42)     Additionally, exploiting the infirmities and disabilities of consumers of goods and services is efined as a unconscionable act, and subjects suppliers to liability; including liability for the acts of their agents.

43)     I suffered extreme retaliation from judges of The Johnson County KS District Court for arguing in two debt collections cases (with relation to the events of the OnForce Insurance Enterprise and my workers compensation claim) that the Kansas Consumer Protection Act does not create an exemption for "agents" in the role of attorneys who commit deceptive and unconscionable acts and practices in the enforcement or defense of contracts.

44)     This retaliation included the threats of murder made against me on December 15th, 2015 as alleged in my other, inter-related cases.

45)     My legal theory was never-the-less affirmed by Judge James F. Vano of The Johnson County District Court in the case of Barclay's Bank Delaware v. Sullivan; consistent with the findings under the Fair Debt Collections Practices Act in Jerman v. Carlisle and another case the name of which I cannot remember at the moment, which affirmed that a lawyer who engages in debt collections may be liable for consumer protection claims arising out of litigation activities. In other words, I have prior judicial support for the argument that litigation is not an exempt activity where deceptive and unconscionable litigation tactics are used against a disabled

42

person; but arguing that position caused crippling, harmful, and potentially life-threatening and even fatal retaliation.

46)     Most prominently, in the case of Nebraska Furniture Mart v. Sullivan; the attorneys for Nebraska Furniture Mart (Jo Ann Butaud, Steve N. Gatzoulis, and Merle Parks of the law firm of Evans & Mullinex) repeatedly demanded a global settlement release that would include indemnification of Berkshire Hathaway and all parent and sister organizations of Nebraska Furniture Mart under the umbrella of Berkshire Hathaway.

47)     On April 3rd, 2014, my attorney, Melinda Young, advised me not to accept the settlement demands of Nebraska Furniture Mart. Speaking through her assistant, Melissa Bush, Ms. Young stated that if I signed the Nebraska Furniture Mart settlement demands "she won't be able to get you medical care."

48)     Based upon Ms. Young's advice, I rejected Nebraska Furniture Mart's Settlement demands; and continued to reject them until they were modified on April 6th, 2016…nearly four months after I was threatened with murder.

49)     I never got to speak to my attorney, Melinda Young, personally until May 7th, 2014; and again on May 27th, 2014. All of my communications prior to that time went through her assistant, Melissa Bush.

50)     During my two conversations with Melinda Young, she refused to investigate the theory that OnForce and The Hartford were engaged in a fraudulent enterprise, and suggested that I may want to seek a different attorney to represent those claims. I agreed to allow her to continue to litigate the case according to her professional judgment; while I was completely consumed with defending against Nebraska Furniture Mart and Barclay's Bank Delaware's increasingly abusive debt collections litigation.

51)     It is 12:24 PM, August 11, 2022; and I just typed for one hour until the pain became unbearable. I then laid down, and my foot went totally paralyzed. I have been making a video as I type, and as these symptoms occur, demonstrating that even sitting up and typing for an hour causes extreme pain and pinching of the nerves to the point of temporary and positional paralysis. The positional paralysis is particularly important, as it demonstrates that sitting upright causes the dilation of the cysts from CSF pressure, and pinching of the sacral and lumbar nerve roots at exactly the site of my original and still untreated herniated discs.

52)     But even as recently as May 17th, 3033 when a doctor at Menorah medical center observed these symptoms and tested my legs for strength, she wrote that she could not tell how hard I was trying; implying that I might be faking or exaggerating my symptoms.

53)      She also admitted that she had never heard of Tarlov Cysts; and when

she agreed to order an MRI, she ordered the incorrect MRI for diagnosing

sacral Tarlov Cysts; despite the fact that I had provided her with the

recommended MRI specifications from The Tarlov Cyst Disease

Foundation.

54)      On August 12th, 2016 I went to Johnson County Imaging to pick up a

replacement MRI CD, as all of my copies mysteriously disappeared when

Michelle Safford moved out. I had called them several days earlier asking

for a reread to specifically report all Tarlov Cysts found so that I could

request the specific and appropriate medical care and evaluations from The

Hartford through John M. Graham, Jr.

55)      Mr. Graham had dismissed the claims adjuster who was previously

handling my case, and assigned himself as my claims adjuster in addition to

being opposing counsel.

56)      Mr. Graham had refused additional medical evaluations when I

requested them in November of 2015, December of 2015, January of 2016

and February of 2016.

57)      When I went to pick up the CD and a new written report from Johnson

County Imaging, I was informed that the images from my MRI had been

mysteriously purged from the system. The staff and cotors had never seen

this happen before. But the provided me with a copy of the written report; and quoted me %667 if I wanted to personally pay for the required imaging to diagnose and report the Tarlov Cysts.

58)

59)

60)

61)     Denials made in bad faith or solely premised upon their perceived ability to exploit my disabilities to further delay justice and medical care are illegal, as well as deceptive and unconscionable acts and practices; prohibited by RICO, common law frauds, and the Kansas Consumer Protection Act; and actionable under other legal theories as well.

62)     Of the above named defendants:  The Hartford, Berkshire Hathaway, United States Liability Insurance, Wells Fargo, and "Several Unknown Employees" are known to have participated in the *original* creation of and subsequent breech of the contracts between OnForce and Scott B. Sullivan for workers compensation, errors and omissions, and general liability insurance.

63)     All other defendants, as well as The Hartford, Berkshire Hathaway, USLI, Wells Fargo, and "Several unknown Employees" of the involved

corporations are alleged to have participated in separate and severable claims subsequent to the original OnForce.com illegal insurance enterprise

64)     The violations and particularly the cover ups of the original and subsequent violations are ongoing, active and distinct violations.

65)     I have had several severe escalations to my spinal and other symptoms over during 2022. This includes not only increased levels of pain and incapacity; but also new symptoms never before experienced which are indicative of the ongoing and escalating nerve damage that I am suffering. This includes intermittent paralysis in my left foot, in addition to my right foot paralysis which has been occurring for years; my first episode of full below the waist paralysis for approximately 1 hour on April 1, 2022; increasing frequency, intensity and persistence of the "thunderclap headaches", dizziness, vomiting, nausea, and other symptoms consistent with cerebral spinal fluid leakage, CSF hypotension, and expanding Tarlov Cysts.

66)     And it is the nature of my original, still untreated spinal injury the herniated discs which were first identified on April 3rd, 2012, and for which I was supposed to receive surgery in August of 2012 by recommendation of Dr. John Ciccarelli) and the complications arising from the formation of Tarlov Cysts that I have been experiencing incremental and potentially

permanent nerve damage each and every day that my medical care is delayed.

67)     The longer that my access to *curative* medical care is delayed; the more likely the nerve damage will become more extensive, more crippling, more disabling and incapacitating, and the more likely that it will become permanent. As with other medical conditions, the prognosis for a cure is better when the conditions are treated early.

68)     I am in excess of 88% functionally impaired, as evaluated and confirmed by Dr. Estaban Azevedo in September and October of 2014.

69)     Doctor Azevedo was the first and ONLY doctor assigned by The Hartford to perform full functional impairment analysis according to AMA Guides.

70)     On July 14th, 2014, Dr. Edward Prostice was retained…according to my attorney Melinda Young…by The Hartford with the expectation that he would perform full functional analysis as well as recommend and provide treatments options.

71)     But, upon my arrival to the appointment with Dr. Prostic, I was informed that he would not be performing full evaluations or treatment options because, in his own words, he was not being paid enough to do that. His belief about the intended scope of the appointment was that he would

perform a records review and narrowly express an expert opinion on whether or not he believed that Dr. Ciccarelli's surgical recommendation would cure me.

72)      Notably, Dr. Prostic did not express any opinion on the extent of my disabilities; stating only that he believed a discectomy had only a 25% chance of curing my symptoms. While this could be interpreted in many ways; it is a confirmation of the reality of my symptoms and of the presence of the serverly herniated discs. In other words, he confirmed that I am not faking my injury or disabilities; believed that the herniated discs were probably only a partial cure; and refused to order or perform any further diagnostics or alternative recommendations; stating that he was explicitly instructed not to and offered only a portion of his normal fee for the visit.

73)      I was first evaluated for functional impairment by Dr. Estaban Azevedo of Advanced Physical Therapy two months later, on September 5th, 2014; and then given 12 PT sessions in six weeks followed by a final evaluation. Dr. Azevedo confirmed my extensive disabilities, including in excess of 80% functional impairment, and wrote that I may never be abnle to work again…even in sedentary work…because my symptoms were too severe, even from sitting upright and especially after walking under 100 feet.

74)      This was the only treatment that I ever received under workers

compensation, subsequent to the two epidural steroid injections performed

by Dr. Bruning in May of 2012.

75)      I cannot stress urgently enough how painful it is for me to sit up and

type even for one full hour. And while I can push myself beyond my limits,

and tolerate the extremes of pain for short periods of time; doing so causes

such severe flare-ups that I will be almost completely bed-ridden for days

after the type of "push" that I am forced to endure in the final days before

deadlines expire.

76)      Perhaps more importantly though, or perhaps more objectively and

scientifically, the herniated discs and Tarlov Cysts and other comorbid

spinal pathologies that I suffer are literally classified as "medical

emergency" because every trauma to my spinal nerve roots (including the

trauma sustained from sitting upright and typing) does incremental and

likely now permanent damage to the nerves of my spine.

77)      Recent clinical research has been published which confirms the

additional severity and critical nature of Tarlov Cysts when combined with

other pathologies such as nearby herniated discs, in what is described as

"double crush syndrome"; where the nerve roots of the caude equina are

being crushed at two distinct levels; such as the L5-S1 crushing from the herniated discs plus the sacral nerve root crushing from the Tarlov Cysts.

78)    The presence and relevance of Tarlov Cysts was concealed from me by all of my doctors prior to October of 2015. And after October of 2015, I experienced an even greater level of abuse from most of my doctors; with many of them explicitly denying that Tarlov Cysts ever cause symptoms. This was thoroughly documented in my previous cases filed with the court and incorporated herein by reference.

79)    After I was diagnosed with Tarlov Cysts, two months later on December 15th, 2015 I was threatened with murder. That threat was delivered by my wife, Michelle Safford, who claimed that she was taken, shown photographs with which I would be blackmailed, and told to inform me that I would be murdered, that my murder would be made to look like a suicide; but that I would be allowed to "leave the state with as much as you can carry" if I agreed to drop my pending legal claims involving OnForce, The Hartford, Berkshire Hathaway, et. Al.

80)    I continued to seek medical care through various sources, including AdventHealth Emergency Room visits in February and November of 2016 (Dr. Messerli and Dr. Schmidt). Dr. Messerli, in particular, contacted The Hartford's attorney John M. Graham, Jr. to confirm my workers

compensation claim; and afterwards she never even returned to the examination room; but sent two nurses with discharge instructions and a Release for Work which I refused to sign. Never have I ever had an ER physician ask me to sign a work release. And Dr. Messerli did not perform any spinal examination or imaging whatsoever. My complaint that day was from the dizziness, falling down, nausea and vomiting that I suffered as a result of sitting up too long writing legal pleadings for a Berkshire Hathaway inter-related case. Dr. Messerli only did a head CT; and then released me for work without evaluating my spinal condition whatsoever. I have alleged this was a malicious and conspiratorial act, intended to obstruct my access to benefits through The Hartford and OnFOrce. And I note that at that point I still had no explanation what Tarlov Cysts were; so I did not understand yet the connection.

81)     I still had no explanation of Tarlov Cysts because of Dr. McCowen's alleged participation in creating false medical records on January 19th, 2016…my first follow up with any doctor after finding out about the Tarlov Cysts, and that being after the threat of murder and after Michelle had abandoned our relationship. Dr. McCowen explicitly said "Scott, I'm not going to look at your back" as he entered the room; performed no examination, but created a medical record in which he accused me of

schizophrenia and possibly psychosis…diagnoses which I have never received from any mental health professional, and which he made without even a single mental health question being asked. This was alleged to be a part of the conspiracy involving Michelle Safford, Diana Rutherford (my mother) and then involving Dr. McCowen in their efforts to obstruct justice and to obstruct me from getting medical care.

82)     And I've jumped a ahead quite a bit. After Dr. Azevedo rated me 88% functionally impaired, and this being after my attorney, Melinda Young, had withdrawn from my case under those suspicious circumstances; John M. Graham, Jr. appointed himself as both my claims adjuster and as the opposing counsel in the still pending workers compensation claim; and he instructed me to be evaluated by Dr. David Clymer in November of 2014. Dr. Clymer performed a very cursory examination, and specifically avoided palpitating below the waist, and testing for sensitivity in the toes, or overall functional impairment. The details of his examination were recorded, and Michelle Safford was present as a witness and taking notes. Based upon this cursory and allegedly deceptive examination, he rated me only 10% "body as a whole", but without an attached functional impairment rating.

83)     Anyone familiar with AMA ratings guides knows (which I did not know yet at the time) that "body as a whole" and "functional impairment"

are two different things; each being only a portion of the evaluation required for a work comp disability rating. In short, a person can be 88% functionally impaired, even though their injury affects only 10% of the body as a whole.

84)     I continued to try to get attornets to represente me, which none would do after Melinda Young withdrew from my case, and particularly after Administrative Law Judge Kenneth Hursh had physically assaulted me.

85)     I also continued to try to get medical care; which included the October 2015 Er visit to Menorah at which the Tarlov Cysts were first revealed to me.

86)     And I apologize, I know I am rambling an disorganized. That is the effect of my disabilities.

87)     After I was told about the Tarlov Cysts, and after Dr. McCowen refused to examine me at all; I next went to APRN Carpenter at Dr. Clough's office, Neurosurgery of South Kansas City. I chose them because I was calling every neurosurgeon listed and they were the first to even acknowledge that they had heard of Tarlov Cysts. But in retrospect, I phrased my question incorrectly: I asked, before setting an appointment if they were "familiar with" Tarlov Cyst Disease; because Ii did not know yet that there was actually a  controversy and wide-spread conspiracies among

neurosurgeons and radiologists to not inform patients when we have Tarlov Cysts.

88)     APRN Carpenter ordered a new MRI and a EMG which confirmed the presence of the Tarlov Cysts and some nerve deficit at L5-S1. Again though they avoided testing at sacral dermatomes, just as Dr. Prostic had avoided testing sacral dermatomes. (I think I forgot to complete that part of the allegations against Dr. Prostic above).

89)     Then in May of 2016 when I called for my results from Neurosurgey of South KC. The nurse told me that they found nothing. But when I inquired specifically about the Tarlov Cysts, she said that yes, they did confirm those; and sort of in an "off-the-record" way told me that I should call Dr. Frank Feigenbaum in Dallas, TX.

90)     I attempted to get an evaluation from Dr. Feigenbaum, but he refused due to my open workers compensation claim.

91)     I contacted the Tarlov Cyst Disease Foundation, speaking directly with the President, Reta Honey-Heirs; and she referred me to Dr. Feigenbaum and Dr. Rudolph Schrot in Sacramento, CA…who also refused to take me as a patient because of the open workers compensation claim.

92)     I returned to Neurosurgery of South KC in December of 2016 to try to order an updated MRI as my symptoms were still worsening; and this time

APRN Carpenter wrote that no Tarlov Cysts were found; but ordered a new MRI from KU anyway.

93)     The new KU MRIs were performed in Feburary of 2017; and this time theu used the April 2014 MRIs as comparison studies, and wrote that the Tarlov Cysts had not changed; but confirmed they were present. This was the first time that I knew that KU knew that the cysts were on the April 2014 MRI and refused to tell me or to include them in any of their diagnoses.

94)     And I really can't even think let alone type, so I'm going to lay down again for an hour before trying again.

95)     X

96)     X

97)     X

98)     X

99)     This is why I suffer increasing loss of bowel and bladder control, and more frequent and longer lasting "flare-ups" of my genital and rectal and abdominal pain, more severe longer lasting and more frequent episodes of partial paralysis, and more intense, more frequent and longer lasting "Thunderclap Heacaches" caused by intracranial cerebral spinal fluid hypotension.

56

100)     In short, the delays that these defendants and those with whom they
have conspired and the obstruction of my medical care has now left me
likely permanently damaged and permanently physically maimed. It is of the
utmost importance that their crimes and frauds stop immediately before I
end up dead.

101)     In addition to stopping their ongoing crimes; it is necessary to stop the
dissemination of fraudulently created medical and mental health records
which are still being used against me to obstruct my access to medical care
through all sources.

102)     And it is necessary to replace all of those fraudulently created medical
records with the full truth about the last ten years of obstruction of my
medical care by these and other defendants.

103)     As the court is most assuredly aware, long delays in medical care are
used by health care providers and courts alike as a "flag" indicative of
…how to phrase this: Even in the case law that I have only recently read, it
is considered "evidence" that a person is faking their disabilities when they
do not go to the Emergency Room every single day. But if you go to the
Emergency Room every single day that you have these symptoms, that is
considered a red flag that you are opioid seeking and doctor shopping.

104)    The Hartford through their claims adjusters and their attorney John

M.Graham, Jr. directly provided false information to health care providers

on multiple occasions, including in emergency room settings, such as on

February 16th, 2016 to Dr. Messerli at Shawnee Mission Medical Center.

105)    Additionally, on multiple occasions I tried to use my $500 "non-

authorized" stipend to get second opinions and consultations with surgeons

at The University of Kansas Medical Center and AdventHealth and their

affiliated spinal surgeons at Neurosurgery Associates; only to have The

Hartford first confirm to me that the $500 was still available and had not

been used; then to have them refuse to pay surgeons with whom I consulted.

106)    Additionally, during July of 2014 and November of 2014 when The

Hartford chose two surgeons of their own to perform examinations and

evaluations (Dr. David Clymer and Dr. Edward Prostic, respectively); the

Hartford then refused to pay their own chosen doctors, and both of them sent

me the bills for their services. The Hartford was not even paying their own

doctors; and would not release the $500 non-authorized funds to any of my

doctors; thus resulting in unpaid medical bills and animosity between my

chosen doctors and even between their chosen doctors and me.

107)    From the very beginning The Hartford and their chosen doctors were

withholding diagnostic information from me; beginningwith Dr. Tegumsen

Wakwaya withholding the extent of the damage to my spine until after I received an MRI on April 3rd, 2012; and then with all of my doctors withholding the diagnosis of Tarlov Cyst Disease, though the cysts were visible on imaging as far back as April of 2012.

108)   By the time that I found out that I had the cysts; I was already "blacklisted" by AdventHealth, The University of Kansas Medical Center, and HCA primary care physicians both for non-payment and for the fraudulently created belief that I was an opioid seekr, a fraud, or mentally ill; with no physical damage to my spine.

109)   I was originally given work restrictions which OnForce could not and would not accommodate in February 14th, 2012 by Dr. Tegumsen Wakwaya of Concentra (selected hcp of The Hartford).

110)   Dr. Wakwaya withheld diagnostic information from the first set of x-rays taken on February 14th, 2012; and then participated along with Laduska Anne Haney – my claims adjuster at The Hartford – in the first instance of what I have termed "staged non-compliance" by instructing me to follow up with my primary care physician (Dr. Stephen Nolker of St. Luke's Primary); but including in the written report that I was to follow up with Dr. Wakwaya in seven days on February 21st, 2012.

111)     Concentra and Dr. Wakwaya refused to see me for a follow up; claiming that I was only approved for a single visit; and then The Hartford via Laduska Anne Haney threatened to close my claim for non compliance for not following up with Dr. Wakwaya.

112)     The second instance of staged non-compliance involved Dr. John Ciccarelli in August of 2012. Dr. Ciccarelli had been selected by The Hartford after my first MRI on April 3rd, 2012 showed herniated discs. He ordered two rounds of epidural injections which were done in May; and by July my condition had worsened to the point that on July 31st, 2012, Dr. Ciccarelli requested surgery approval.

113)     On August 15th, and August 22nd, 2012, The Hartford Laduska Anne Haney mailed two denial letters denying Dr. Ciccarelli's request for surgery, then on August 29th, 2012, Dr. Ciccarelli wrote a letter to The Hartford claiming that I had failed to show up for my pre-surgery labs, that he considered me "non-compliant", and that my case should be closed. He further refused to see me again after my case was eventually reopened subsequent to an attorney (Michael Downing) contacting the Hartford on my behalf.

114)     In December and January of 2012-2013 I sought consultations from Dr. Stephen Hess of Neurosurgeay Associates; who recommended a

different surgery from Dr. Ciccarelli. But The Hartford refused to pay Dr. Hess out of the non-authorized stipend mandated by Kansas law, and Dr. Hess refused further services.

115)     As a result of the non-payment to Dr. Hess and AdventHealth (Shawnee Mission Medical Center) physicians and ERs; I was blacklisted by AdventHealth, who to this day will not accept me as a new patient for primary or neurosurgical care.

116)     Similarly, I went to great lengths to prearrange with Laduska Haney for the $500 to be paid to The University of Kansas Hospital, and worked with KU's work comp liason's office to select a physician – Dr. Larry Cordell – to perform evaluations; but The Hartford refused to pay the $500; and later ( in January of 2016) confirmed this $500 still available for use. I was subsequently blacklisted by The University of Kansas Health Systems, and can no longer be seen for primary care or spine center consultations.

117)     My disabilities, and the causes of my disabilities (herniated discs and Tarlov Cysts, in addition to my escalating mental illness) have been documented and increasing ever since the Hartford and their alleged coconspirators began their interference with my medical care and workers compensation claims.

118)     The Hartford claims adjusters appeared to be unaware of the nature of

my employment with OnForce until March 9th, 2012 when I spoke with

Carol Morris of The Hartford personally due to my dissatisfaction with how

my care was being handled by Laduska Haney and Dr. Wakwaya.

119)     At that time I informed Ms. Morris that I was an independent

contractor and that OnForce was charging fees to ICs such as myself

nationwide for coverage under their corporate workers compensation

insurance.

120)     Ms. Morris responded that they were not allowed to do that; and that

she had never heard anything like that before; and that she would look into

it.

121)     But Ms. Morris did not, nor did Laduska Haney, ever stop exercising

complete control over my medical care; and preventing me from using my

private insurance to seek care through my own selected physicians.

122)     Mike Fiske was designated as my contact at OnForce in February of

2012, and he too seemed unaware of how OnForce was supposed to handle

claims under this new "policy" of workers compensation benefits. He

described it as "a different kind of policy" and deferred all medical care and

benefits decisions to The Hartford, while simultaneously refusing to assign

any light or sedentary work opportunities while I was under Dr. Wakwaya or Dr. Ciccarelli's care.

123)     Dr. Stephen Nolker, my primary care physician, attempted to get me approved for care until the day that my MRIs were forwarded to his office for review. At that point, I was cut off from care by St. Luke's South Primary and told to…make that yelled at to "GO CALL WORK COMP."

124)     At all times prior to October 15th, 2015 all of my health care providers withheld from me the fact that I had formed Tarlov Cysts directly below the site of my injury.

125)     And two months to the day after I was diagnosed with Tarlov Cysts, I was told by my wife, Michelle Safford that … and as you will understand, I still cannot fully complete this sentence without fear…that I would be murdered and "they will make it look like a suicide" if I did not drop all of my pending claims against OnForce, The Hartford, and Berkshire Hathaway.

126)     I have tried, literally for years, to write and file the complete details of these claims. And not only does sitting up and typing for this long cause extreme flare-ups of my physical pain; but the fear of retaliation, particularly after I was threatened with murder, literally paralyzes me from writing and filing the full details of those threats.

127)     The threats to murder me as communicated to me by Ms. Safford
were very specific as to how I would be murdered, how my murder would be
concealed, where the threats were communicated to her and under what
circumstances; and the where and the circumstances would reveal the
identities of the people who directly threatened me and would, I believe, put
my life in imminent danger.

128)     I have discussed this with mental health experts, and literally every
one of them believes me. Not once have I ever been diagnosed with
schizophrenia, psychosis, somatic symptoms disorder, hypochondira or any
of the other false mental health diagnoses that have been used as strategies to
defraud the court and defame me as a witness and victim of these crimes.

129)     And at this very moment, I have been trying since literally 2:00 a.m.;
and the combination of my physical disabilities, my mental disabilities, and
the …I will just call it the entropy of everything around me that has
degenerated into barely functional status: i.e. my computer, my truck, my
plumbing, my appliances.

130)     I spend about 20 hours every day laying down, most of that in the
fetal position, having extreme and completely debilitating flare ups of my
symptoms. The remaining 4 hours is split between trying to write legal

pleadings, cooking, going to the bathroom, and repairing the things that are breaking all around me.

131)    My life has become literally unbearable, to the point that I have been monitored weekly by Johnson County Mental Health for the past three months; including weekly welfare checkups by telephone and in person visits with police escort when I don't answer or call them back soon enough.

132)    I have had suicidal thoughts since early in 2014; and experienced compulsive suicidal thoughts in August of 2016 that prompted me to seek emergency intervention with my counselor at church Elder Doug Ludwig.

133)    The previously pleaded retaliation at my church escalated to the point that on October 28th, 2018…ten days before I filed my first pleadings…Elder Ludwig literally suggested that I should consider suicide; because my pain and disability were well known to him, as were all of the facts of these cases; and it was his express opinion that "there are too many evil people in the world" that would prevent me from every getting medical care or justice. It was Elder Ludwig's suggestion that I commit suicide…witnessed by multiple people at the New Haven Seventh-Day Adventist Church…that was my final attempt to resolve the obstruction of my medical care without litigation.

134)    Subsequent to the filing of my original claims and the appellate practice involved, I have attempted to get care through AdventHealth and The University of Kansas in cooperation with Health Partnerships and Johnson County Mental Health; each time resulting in increasing abuse, neglect and retaliation.

135)    I am seeking relief under the Racketeering Influenced Corrupt Organizations Act for the acts of wire and mail fraud, witness intimidation, and obstruction of justice as predicate acts committed by these defendants and by those with whom they have conspired to conceal OnForce's frauds and to obstruct my access to justice and medical care.

136)    I am seeking relief under the Civil Rights Acts both for the obstruction of justice and for the targeting of my most fundamental civil rights; including my right to autonomy and control over my own body and health care, and interference with my rights to enter into and enforce contracts with health care providers of my choosing, and ultimately by leaving me fully disabled and unemployable, interfering with my rights and ability to enter into contracts for employement, health insurance, and to enforce contracts for workers compensation benefits, and to receive disability benefits.

137)   Between April of 2014 through August 13th 2014 and throughout
2015, my attorney, Melinda Young, conspired with opposing counsel John
M. Graham, Jr., Administrative Law Judge Kenneth Hursh, her attorney
Time Elliot, The Hartford, OnForce, and Peter Cannone and Adecco to 1)
conceal the pending sale of OnForce to Adecco, and 2) to retaliate against
me through witness intimidation, wire and mail fraud, eliciting false medical
records, and 3) to obstruction of justice with respect both to my pending
workers compensation claim and to the allegations of fraud and racketeering
against OnForce, The Hartford, and Berkshire Hathaway, et. Al.

138)   This includes, without limitation, their participation, directly or
indirectly in the threats to murder me from December 15th, 2015…those
threats being still active and ongoing.

139)   No one has ever repealed the threat to murder me, nor in any way to
settle these claims without litigation.

140)   Everyone involved continues to publish, support, and defend the false
medical records, court records, and other defamatory statements made
against me for the express purpose of preventing litigation or law
enforcement of all of these claims (including the claims in the inter-related
cases noted by the court.)

141)     Those false records, and particularly the false and fraudulently written court records (because they are publicly available) continue to do me harm to my reputation and to my ability to get medical care.

142)     This fact is especially true where the court treats denials of fact and allegations made by attorneys with no knowledge or information as if they are evidence or testimony.

143)     For example, when opposing attorneys argue that the fact that I can type proves that I am not disabled or incapacitated; it is treated as if it is their expert testimony that I am not disabled or incapacitated. This ignores not only the fact that they are not medical experts, but also the fact that they have never met me, never spoken to me, and never performed a Rule 11 required "inquiry reasonable under the circumstances" to verify if their denials, allegations or assertions are even true.

144)     Additionally, everyone ignores the fact that typing causes me to experience intense stabbing pains to the genitals and rectum, leg spasms, foot paralysis, thunderclap headaches, and loss of bowel and bladder control, in addition to unbearable pain and compulsive suicidal thoughts. I am neither employable nor capable of defending my rights in a court of law merely because I can type. The fact that what I type is so woefully deficient and full of evidence that my pain and disabilities are real is actually more

admissible as evidence; because I am the only one here experiencing the crippling effects of physical and psychological disability caused by typing.

145)     In the interim between my two appointments with Dr. Hylton, my attorney in my workers compensation claim , Melinda Young, would finally speak with me on May 7th, 2014 -- (she had never personally spoken with me after taking my case on December of 2013) and would ask me a series of questions which seemed to indicate that she had only then become aware of the nature of the OnForce insurance practices. We would speak again on May 27th, 2014, and after asking me again for more details on OnForce's practices, she asked if I would release her from her obligation to represent me. I explained that I still needed a lawyer, particularly in light of the fact that she had filed my case in the Kansas Department of Labor's workers compensation system; rather than as an insurance fraud case as I had originally asked.

146)     Ms. Young informed me that she was able to get me approved for an examination with Dr. Clymer of Carondolet for July 14th, 2014. At the conclusion of my examination with Dr. Clymer (which will be detailed elsewhere to further document the pattern of negligent and intentionally erroneous diagnoses which I am alleging) Ms. Young filed a Motion to Withdraw from my case with the court. I received an email notifying me of

her Motion to Withdraw less than two hours after the conclusion of my examination with Dr. Clymer.

147)     Ms. Young would later continue the Motion's hearing until August 13th, 2014 and on August 11th, 2014, OnForce was sold to Adecco in a transaction that occurred in Switzerland at approximately 3:30 am, local time. At 4:20 am, Ms. Young would fax a Motion for Preliminary Hearing to Administrative Law Judge Kenneth Hursh.

148)     Neither ALJ Hursh nor my attorney notified me of the Motion for a Preliminary hearing to be held two days later, on August 13th, 2014. Ms. Young did not appear at the hearing, or submit an affidavit in support of her Motion to Dismiss; instead hiring an insurance subrogation specialist named Tim Elliot to represent her; and who also claimed that he would act as my attorney for the day if Ms. Young's Motion was denied. When asked if that would be a conflict of interest in light of his normal practice as a subrogation specialist representing insurance companies; he stated the he did not represent any of the involved insurers; and therefore no conflict of interest would exist. When asked if he had ever represented a workers' compensation claimant, he said that he had, but he could not remember when.

149)     ALJ Hursh conducted the hearing on the Motion to Withdraw, and granted me exactly two words of oral argument before ruling in Ms. Young's

favor. He then waited until after this ruling in which he released Ms. Young

from her obligation to represent me, and after her attorney had left the court

to inform me that he was going to perform the Preliminary hearing on my

workers compensation claim. When I said that I had not received a notice

that there would be a preliminary hearing that day, Judge Hursh responded,

"Here" and tossed his copy of the Motion on the counsel table in front of me.

It included no requests for benefits, and had no medical records or any other

documentation attached.

150)     I requested appointment of counsel which was denied. And requested

a continuance, which he eventually granted. After which opposing counsel,

John M. Graham, Jr. said that OnForce and The Hartford had agreed to give

me 12 sessions of physical therapy

151)     I asked ALJ Hursh what was his responsibility if I reported fraud, and

I informed Judge Hursh of my belief that there was no workers

compensation insurance which covered me, at which point John Graham Jr.

Stated that there was insurance in effect;  I again asked Judge Hurst to take a

fraud report; was ejected from the hearing room.

152)     I will provide further details and a transcript in a supplementary

affidavit; as this is a key element to the allegations of harm, injury, and

damages against the University of Kansas for not diagnosing my Tarlov Cyst

Disease at that time; as well as an underlying reason for my constitutional argument that a citizen has a right to a Federal trial on disputes against their home state where there is sufficient evidence of a conflict of interest whereby the State has engaged in multiple conspiracies by and through state officials, including judges, and can be reasonably presumed to lack the impartiality to offer a fair trial to a particular individual.

153)     And this leads to a fact for which no one will grant me an honest presumption of truth: but which is a basis to much of the State sponsored abuse and harassment and the alleged threats made against me. After I was ejected from the courtroom, I left the Department of Labor Workers Compensation Division offices, into the hallway of the public office building which housed the offices; and I waited while Michelle gathered my things.

154)     Judge Hursh and opposing counsel John Graham Jr. stood in the doorway smiling at me, mockingly, and I began to pray. I could hear Michelle crying in the background, and the combination of my attorney withdrawing, OnForce being sold, and the preliminary hearing being called to order without any notice had convinced us both that there was essentially no hope that I would ever get medical care. The workers compensation system and insurance commission were simply too corrupt.

155)     As Judge Hursh laughed at my prayer and John Graham smiled in the background, I began to recite the story of The Good Samaritan. This angered Judge Hursh, and when Michelle had gotten my things gathered, Judge Hursh ordered me to get on the elevator and leave. (The Work Comp Offices were on the second floor) As the elevator doors closed, I saw Judge Hursh running toward the stairs to race downstairs ahead of us. He went ahead of us, and waited just outside, holding the door, and just as I rolled past him in my wheelchair, he kicked me, then ran rapidly back into the building.

156)     I called out that what he had done was assault, and he turned around, and came back outside, phone in hand, calling 911. A police report was filed, and I asked the police and the Lenexa, KS city prosecutor to file an assault charge; which they refused to do. Subsequent to that incident, I was unable to obtain replacement counsel; and many of the attorneys with whom I spoke said that they could not represent me after the assault allegation against Judge Hursh; one specifically commenting "We need these judges."

157)     The Motion for Preliminary hearing was faxed to the court on August 11th, 2014 at 4:20 a.m., approximately 30 minutes after Adecco purchased OnForce in a sale that had been rescheduled and moved to Geneva, Switzerland.

158)     Only Peter Cannone (among the defendants) would have had knowledge of the impending sale of OnForce to Adecco, and it is alleged that based upon this knowledge he, John M. Graham, Jr. and Melinda Young conspired to delay my workers compensation claim; to schedule a fraudulent medical examination with Dr. David Clymer, and for Ms. Young to withdraw from my case immediately after the sale to Adecco completed.

159)     Because the sale was delayed, the hearing on Ms. Young's Motion to withdraw had to be rescheduled until August 13th, 2014.

160)     As soon as…and I mean literally the moment that Ms. Young received notice that the sale to Adecco had completed…she faxed a Motion for Preliminary Hearing to Judge Kenneth Hursh. She did not inform me that the Preliminary Hearing would be held by surprise immediately after her Motion to Withdraw was granted. And she did not request any medical care or benefits, or attach any medical records to the Motion for Preliminary Hearing.

161)     Her and Mr. Graham and Judge Hursh's goal in other words was to render me a pro se litigant; and immediately conduct the preliminary hearing without giving me any notice that it was going to take place; and without any medical records or requests for benefits. Had the hearing been conducted, it is presumed the ruling of law issued by Judge Hursh…intended

74

to be issued by Judge Hursh on August 13th, 2014…would have been that "I" did not request any benefits in my Motion for Preliminary hearing (again…that my attorney filed AFTER she had already moved to withdraw, without giving me notice, and after OnForce had just been sold); and therefore my case would be closed.

162)    After I was diagnosed with Tarlov Cysts, I emailed John M. Graham, Jr. requesting additional evaluation and treatment, and he declined. I then sent a Notice of Intent in February of 2016 demanding treatment and informing them that under the Workers Compensation Act they would be liable for payment of any and all medical bills incurred while they were denying medical care and even evaluations.

163)    Therefore, by law, The Hartford and OnForce, as respondents, are liable for all medical care and diagnoses for my spinal injuries from Decebmer of 2015 through the present.

164)    Additionally, whatever the contract with OnForce and The Hartford may be interpreted to be; it was presented as "workers compensation" and it entitles me to the same benefis as workers compensation; even if it is a non-technically-workers-compensation private contract.

165)    Under the workers compensation act, and contrary to the interpretation made by Judge Angel Mitchell, the employer and insurer are

required to provide medical care until the worker reaches Maximum Medical Improvement as adjudged by a court of law. Even if a settlement is reached, unless the settlement explicitly waives all rights to future medical care; then future escalations and symptoms arising out of the original injury, including future iagtrogenic harms or harms caused by failure to properly diagnose and treat the injury, are compensable unless and until future medical is waived explicitly.

166)     This is necessary because, especially with spinal injuries, it is not possible to know that the treatment given will be sufficient if new pathologies are discovered, or, for example, as commonly happens, if a fusion surgery screws come loose and additional surgery is required.

167)     In other words, workers compensation inherently is open ended as to its expiration of rights to relief until the worker is adjudged to be at Maximum Medical Improvement AND waives future medical benefits.

168)     The entire contract for workers compensation benefits between myself and OnForce is what is included in the insurance FAQs and website descriptions of the insurance enterprise between OnForce, The Hartford and USLI (Berkshire Hathaway); and also is open ended; providing no expiration on future medical needs.

169)     But my ability to seek relief through the court has been actively

obstructed by the health care professionals; both as a part of their opposition

to workers compensation and disability benefits; and as a part of their

conspiracies and enterprises to cover up Tarlov Cyst Disease as a whole.

170)     And The Hartford, OnForce, and Berkshire Hathaway conspired

directly with health care providers to obstruct me from getting the medical

evidence and treatments necessary to seek medical expenses and disability

and off-work benefits through adjudication…either in the Kansas

Department of Labor's Workers Compensation Division or through District

Courts.

171)     And if the rulings that workers compensation is an exclusive remedy,

even where no evidence of an actual workers compensation insurance policy

or an actual compensable employment arrangement exists or is still being

actively concealed by the defendants; the liability to pay medical, damages,

and lost wages and disability benefits would fall to the State of Kansas itself

once OnForce was sold if successor liability did not apply as a continuing

enterprise.

172)     This explains why the State of Kansas was unwilling and the

Department of Labor and Kansas Insurance Commission actually conspired

to cover up the frauds committed by OnForce, The Hartford, and Berkshire

Hathaway. It was in the interests of Kansas to keep me in the workers compensation system under OnForce, The Hartford, and their attorneys' fraudulent practices where they too could join in the false allegations of non-compliance and affirm the fraudulently created medical records of Dr. Ciccarelli, Dr. Prostic, and Dr. Clymet while dismissing the accurate disability evaluation made by Dr. Azevedo…the only doctor to even do a functional examination compliant with the AMA guides.

173)     And by crippling me, tormenting me, and ultimately threatening me with murder and removing ALL of my social support from my wife, my family and even my church; they have intentionally caused and insured that I will not only become increasingly physically disabled, but psychologically traumatized as well.

174)     I reported my first suicidal thoughts to Dr. Clymer on July 14th, 2014; and his response was literally nothing.

175)     Those suicidal thoughts became compulsive suicidal thoughts in August of 2016, at which time I sought care through Mercy and Truth (who literally acted like I had said nothing) and then through Doug Ludwig at the New Haven Seventh-Day Adventist Church.

176)     I continue to consult with Johnson County Mental Health and report my suicidal ideations to all medical professionals; with many of them, like

Megan Caldwell at The University of Kansas and Dr. Mabry at KU respond with anger and retaliation in March of 2022.

177)     And my suicidal ideations are the most severe when trying to write legal pleadings; because not only the pain, but also the complexity of the isses and the long-term evidence of attorneys' and judges' retaliation making the process both physically and psychologically traumatic, as well as com0pletely hopeless, because I will never get better and never be better able to litigate my rights without first getting the medical care that I need.

178)     And to be clear, my mental health professinonals who have evaluated me recognize that my suicidal thoughts and major depressive disorder generally are caused by the unique litigation environment and the fact of my near comlete disability.

179)     My disabilities could have been curd in a single afternoon; and possibly still could be cured in a single afternoon.

180)     But because I ws injured at work and because I suffered a spinal injury, I have faced relentless abuse discriminatin, prejudice and accusations for ten years and ongoing.

181)     People would literally rather see me dead than see me receive workers compensatin benefits or succedd at enforceiing my rights through litigation.

182)     And this is what gives rise to the obstruction of justice claims under

RICO and the disputed applicability of the Civil Rights Acts sections 1981

through 1988. All of these are attacks against my civil rights specifically.

And these are politically motivated attacks by people who universally

consider workers compensation nearly synonymous with socialism (even

though it is always private insurance conracts under Kansas law..except, as

noted, when the company goes out of business or never purchased insurance

and the Kansas fund takes over the financial iability.)

183)     Any technical omission from my pleadings are either inferred from

the facts that are included, or are documentable with evidence affidavits and

testimony which would undeniably overcome summary judgment motions.

184)     It is only my disabilities themselves which prevent me from writing

proper pleadings motions and briefs.

185)     The facts of the cases would not lead to dismissal; even of the ADA

claims, as with Tarlov Cyst Disease it truly is the exception stated in

Johnson by Johnson v.Thompson where everyone with the same disease

faces the same discrimination.

186)     Statutes of limitations defenses should be subject to equitable estoppel

due to the ongoing concealment of both the legal contracts and the medical

truth with the fraudulent intent of obstructing justice; as well as statutory and

equitable tolling due to my incapacity and due to the fact that all of my

disabilities were and are being inflicted uon me by the defendants

specifrically to render me incapable of defending my rights.

187)    Expert testimony including depositions of the cotors whose lawyers

claim that they will testify against me, depositions of every doctor who

created medical records fraudulently denying my disabilities and their

causes, and even lay testimony and mental health testimony must be allowed

before tolling and estoppel defenses could be rejected. They cannot be

rejected as a matter of law; but must be resolved as the basis of the facts.

188)    Any judgments received solely on the basis of my inability to write

legalpleadings motions and briefs will not resolve the disputes or constitute

res judicatat; and the defendants were always aware of this when they chose

these legal strategies of facial attacks on the pleadings and against my

physical and psychological disabilities.

189)    The injury occurred in Kansas, at Talbots in Overland Park KS; while

I was under a contract with Agilisys, said contract facilitated through

OnForce.com.

190)    OnFOrce is not a contractor of onsite services, but rather is a software

as a service company which charges fees for the use of their software to

contractors such as Agilisys and to subcontractors such as myself.

191)    My relationship with OnForce was as a consumer of software as a service; and their relationship was a supplier of software, thus subjecting them to the Kansas Consumer Protection Act and constituting interstate wire fraud.

192)    The Hartford was a part of the enterprise with OnForce specific to the insurance offerings, which are distinct from the software as a service. SO was Berkshire Hathaway.

193)    The Hartford also conspired in all acts of witness intimidation and obstruction of justice through their claims adjusters and attorneys and through their conspiracy with the Department of Labor and specifically with Judge Kenneth Hursh and Jerry Shelor.

194)    The conspiratorial acts of Judges Hursh and Shelor are alleged to have been outside of and beyond the scope of judicial tasks; most especially Judge Hursh's physical assault on August 13th, 2014 and his conspiracy to cover up the sale of OnForce to Adecco and the underlying frauds. This is demonstrated by Judge Hursh's refusal to even hear the allegations of fraud, explicitly stated when I tried to raise them on August 13th, 2014. That was his judicial function, which he refused to perform; because he was directly involved in the non-judicial functions of the conspiracy and cover up.

195)     Judge Shelor and the Kansas Department of Labor and Insurance

Commission were aware of the facts, and conspired to obstruct justice and to

fail to prevent the violations of my civil rights. (section 1986).

196)     My intelligence and knowledge cannot overcome the material fact of

the cysts and herniated discs in my spine, the CSF leakage and hypotension,

or the effects of the intentional infliction of mental anguish and emotional

distress.

197)     I was preliminarily evaluated for a form of PTSD called  "Litigation

Abuse Syndrome" by Dr. Karen Huffer before her death; but we were never

able to get the money for complete evaluation and expert testimony.

198)     I was diagnosed by Johnson County Mental Health with Obsessive

Compulsive Personality Disorder including crippling "perfectionism", high

anxiety discored and "rigid thinking" in March of 2012.

199)     I have never been diagnosed with any form of delusional mental

illness, such as schizophrenia, psychosis, or somatic symptom disorders;

most particularly because all of my mental health professionals know that

my disabilities and the facts that I've alleged are true.

200)     Neither my physical nor mental disabilities will ever improve if I am

persistently subjected to litigation abuse, fraud, threats, and fraud upon the

court by opposing counsel and parties and never allowed to get the physical medical care that I need.

201)     I think I omitted above that when I went to Johnson County Imaging in August of 2016 to get a new copy of my MRI CDs (all of mine went missing when Michelle left…mysteriously) and to ask for a reread and to have them report all Tarlov Cysts found; they told me that my MRI images were "purged" from the system, and they were perplexed because that had never happened before. It is technically impossible fo that to happen by accident due to their redundant data systems; so the images must have been manually deleted after the Tarlov Cysts were reported and I asked for a reread.

202)     This pleading, like my oher pleadings is oviously an incomplete, disorganized and rambling mess…al of which is the result of the disabilities inflicted upon me and perpetuated by these defendants.

203)     I will seek appointment of counsel and leave to amend and correct the pleadings.

204)     I am seeking all rights to relief to which I may be entitled under Federal and State law based upon the facts alleged pursuant to Rule 54(c) and Hall v. Bellmon.

205)    I am seeking relief under RICO for participation in the OnForce

Insurance enterprise and for conspiracy with the OnForce Insurance

enterprise by all of the defendants as described abouve and in forthcoming

afficavits and exhibits.

206)    I am seeking relief under The Civil Rights Acts sections 1981 through

1988; and I acknowledge this will include arguments for correction of

current interpretations which bar civil rights act protections for disabled

under the theory that we are not "persons or classes of persons" as intended

by the Congress of the Reconstruction Era.

207)    Civil Rights Acts relief is claimed under Section 1985 in conjunction

with the involvement of Kansas ALJ's Hursh and Shelor in the cover up of

OnForce's fraudulent practices, and the wire and mail fraud participated in

directly by Judge Hursh on August 13th, 2014 and in the weeks prior to that

hearing.

208)    I am seeking damages under common law fraud, conspiracy to

commit fraud, personal injury, tortuous interference with contracts for

workers compensation benefits (no matter what the OnForce contract is

ultimately interpreted to be); and interference with benefits under my private

health insurance contracts and under contracts with health care providers, all

of whom have relied upon the accumulation of fraudulent medical records instigated by and perpetuated by these defendants.

209)     AndI apologize. But my life is on the line; and I should not be apologizing to the people who are killing me or causing my wrongful death. I have made hundreds of hours of audio and video recordings which document that aI have attempted in earnest to write professional quality legal pleadings for years; and can further document that it is specifically because of the complexity of these frauds and the fear of retaliation and the involvement of Judge Hursh and his physical assault in particular which has been cited most often for attorneys' refusal to offer legal representation.

210)     We are at the point now where everyone just expects me to crawl away and die without bothering them anymore; because they defeated me. And I believe this may be my last opportunity to explain to everyone that I do not owe you my life simply because so many of you so successfully have crippled me and defrauded me and defamed me to date.

211)     I was owed medical care under my contracts; and I was owed integrity and honesty in every stage of defense against those contracts. Crippling people for profit is not a right held by anyone in The United States of America; and even lawyers have not been granted immunity for actions such as those committed against me in the cover up of OnForce's original frauds

and in the standard litigation abuse in the workers compensation system

which Judge Shelor called "The nature of The Beast:

212)